2007-01166
FILED
October 31, 2008
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0001483054

Steven Koch, Esq. (SBN 222938)
GUBLER, KOCH & DEGN LLP
1110 North Chinowth Street
Visalia, California 93291
Tel: (559) 625-9600
Fax: (559) 625-9605

Ira N. Glauber, Esq. (admitted *pro hac vice*)
JAFFE & ASHER LLP
600 Third Avenue
New York, New York 10016
Tel: (212) 687-3000
Fax: (212) 687-9639

Attorneys for Plaintiff American Express
Travel Related Services Company, Inc.

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA

-------------------------------------------------------x

In re                                              :
                                                   :
ABDO ALI AEZAH,                                    :         Chapter 7
                                                   :
                           Debtor.                 :         SMK-2
                                                   :
                                                   :         Case No. 07-11914-A-7
-------------------------------------------------------:
                                                   :
AMERICAN EXPRESS TRAVEL RELATED                    :
SERVICES COMPANY, INC.,                            :
                                                   :
                           Plaintiff,              :         Adv. Pro. No. 07-1166
                                                   :
          v.                                       :
                                                   :
ABDO ALI AEZAH,                                    :
                                                   :
                           Defendant.              :
-------------------------------------------------------x

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following Findings of Fact and Conclusions of Law in support of its

decision dated September 16, 2008 granting the motion of plaintiff American Express Travel

1

RECEIVED
October 29, 2008
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001483054

Related Services Company, Inc. ("American Express" or "Plaintiff") for summary judgment

denying debtor-defendant Abdo Aezah ("the Debtor") a discharge in bankruptcy and denying

dischargeability of Plaintiff's claim against the Debtor:

## PROCEDURAL BACKGROUND

1.     On or about June 28, 2007, the Debtor filed a voluntary petition for bankruptcy

under Chapter 7 of the Bankruptcy Code in this Court.

2.     Prior to the commencement of this Chapter 7 case, American Express commenced

an action in the United States District Court for the Eastern District of California against the

Debtor and others, encaptioned <u>American Express Travel Related Services Company, Inc. v.</u>

<u>D&A Corporation, et al.</u>, 1:04-CV-06737 (the "District Court Action").

3.     On or about August 2, 2005, American Express obtained a judgment against, *inter*

*alia*, the Debtor in the District Court Action in the sum of $3,683,320.97, which still remains due

and owing, together with accrued interest.  Ex.17.1

4.     On October 5, 2007, American Express filed the instant adversary complaint

against the Debtor seeking an adjudication and determination excepting the Debtor's debt to

American Express from discharge pursuant to 11 U.S.C. §523(a)(2) and denying the Debtor a

discharge pursuant to 11 U.S.C. §727(a)(2), (3) and (5).

## JURISDICTION

Jurisdiction exists pursuant to 28 U.S.C. §1334.  Venue is proper under 28 U.S.C.

§1409(a).  This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2) (A),(I),(J), and

(O).

## FINDINGS OF FACT

1.     Plaintiff American Express is a corporation organized and existing under the laws of

the State of New York, having its principal place of business at American Express Tower, World

Financial Center, New York, New York 10285.

2.     D&A Corporation, a wholesale grocery company doing business as Bakersfield

Wholesale Grocery ("Bakersfield Wholesale"), was incorporated by the Debtor in November

---

1 All references herein to exhibits are to exhibits referenced in American Express' summary judgment motion.

2

2003 and had its principal place of business at a warehouse located at 402 California Avenue, Bakersfield, California 93304 (the "Warehouse"). Ex. 1 (original complaint in District Court Action) at ¶ ¶5-6; Ex. 2 at ¶ ¶4-5 (Debtor's answer); Ex. 3.

A.    **Bakersfield Wholesale**

3.    The Debtor operated Bakersfield Wholesale as a wholesale grocery company that sold candy, soda, cigarettes, and other products to mini marts and other retail grocery outlets. Ex. 1 (original complaint in District Court Action) at ¶ ¶5-6; Ex. 2 at ¶ ¶4-5 (Debtor's answer); Ex. 3.

4.    The Debtor was the 100% shareholder and president of Bakersfield Wholesale and owned its Warehouse. Ex. 1 (original complaint in District Court Action) at ¶ ¶5-6; Ex. 2 at ¶ ¶4-5 (Debtor's answer in District Court Action); Ex. 3.

5.    In 2004, the Debtor ran into financial difficulty and borrowed $150,000 from his brother David Aezah ("David") in order to finance the business. Deposition of David on September 13, 2006 and October 9-10, 2006 ("David Tr."), pp. 37-43.

6.    In 2004, the Debtor also owed more than $200,000 on a mortgage due to the former owner of the Warehouse. David Tr. 44; Ex. 4 (Depo Ex. 10).

7.    In or about August 2004, David agreed to forgive the Debtor's debt to David in exchange for David's taking ownership of the Warehouse. David Tr. 37-43.

8.    The Debtor also entered into an agreement with his brother with respect to Bakersfield Wholesale and its Warehouse on or about September 19, 2004, a copy of which is represented by Ex. 5 (Depo Ex. 7).

9.    Both David and the Debtor deny that David had or has an ownership interest in Bakersfield Wholesale.   David Tr. 38, 42-44, 47-49, 53; Abdo Tr. III 160-68; Ex. 5 (Depo Ex. 7); Ex. 6 (Depo Ex. 8).

10.    In August 2004, David began to become directly involved in running Bakersfield Wholesale. For example, on August 31, 2004, David was made a signatory on the accounts of Bakersfield Wholesale. David Tr. 166-67. David also began placing orders for the business and signing checks on its behalf. David Tr. 173-74, 184-89; Ex. 7 (Depo Ex. 30).

11.    Nevertheless, the Debtor remained active in running the business. David Tr. 204.

3

**B.**      **Bakersfield Wholesale is Issued American Express Credit Cards**

12.   At the Debtor's request, American Express issued three separate American Express corporate credit cards for Bakersfield Wholesale, one in the name of Abdo Aezah/Bakersfield Wholesale (Account No. 3794-793179-41002), one in the name of Malaka Aezah/Bakersfield Wholesale (Account No. 3794-793189-41001), and one in the name of Fahd Aizah/Bakersfield Wholesale (Account No. 3796-052859-81006). Ex. 1 (original complaint in District Court Action) at ¶ 15; Ex. 2 at ¶9 (Debtor's answer).

13.   At Debtor's request, American Express also issued a corporate purchase card in the name of D&A Corporation (Account No. 3785-913780-01004); Ex. 1 (original complaint in District Court Action) at ¶ 15; Ex. 2 at ¶9 (Debtor's answer).

14.   Pursuant to the Corporate Account Agreement dated June 25, 2004, the individual whose name appears on the American Express card, as well as the corporation which applied for the card, is responsible for all charges.  Additionally, by accepting, using, and making charges on their American Express corporate credit cards and corporate purchase card, the individual cardholders agreed to be bound by the terms and conditions of the American Express Agreement. Ex. 8 at P52-58.

15.   Prior to November 2004, Bakersfield Wholesale had made only limited purchases on its American Express accounts; for example, it incurred charges of only $56,756.17 in September 2004 and only $295,079.61 in October 2005.  Ex. 9 (P 215-16, 237-39, 251-53).

**C.**      **Debtor Charges $3.6 Million in November and December 2004**

16.   From early to mid-November 2004, the Debtor used the American Express accounts to purchase $1,404,348.86 million worth of cigarettes at Costco on Bakersfield Wholesale's American Express cards.  From November 19 through December 2, 2004, the Debtor charged an additional $2,278,972.11 worth of cigarettes at Costco. (These cigarettes are referred to herein as the "Costco Cigarettes.")  (Depo Ex. 33); Abdo III Tr. 105-14.

17.   Debtor has admitted to making all such purchases on behalf of Bakersfield Wholesale. Ex. 10 (Depo Ex. 33); Abdo III Tr. 105-14.

4

18.   Debtor claims that at least several hundred thousand dollars of these purchases of Costco Cigarettes were made to supply a Bakersfield Wholesale customer which supposedly defrauded him, called A.N.J. Minimart ("ANJ").  In particular, Debtor deposited three checks from ANJ made out to Bakersfield Wholesale into its account at Wells Fargo, for a total amount of $288,484.54. Ex. 11 (Depo Ex. 194): Ex. 12 (Depo Ex. 191);  Abdo III Tr. 115-19, 122; Moen Tr. 18-32.

19.   On November 7, 2004, American Express received electronic payments from Wells Fargo for the Bakersfield Wholesale credit card accounts in the amount of $191,630.51. Ex. 11 (Depo Ex. 194): Ex. 12 (Depo Ex. 191);  Abdo III Tr. 115-19, 122;  Moen Tr. 18-32.  However, on November 18, 2004, Wells Fargo reversed the credits for the ANJ deposits in the amount of $288,484.54, because the ANJ checks were returned for improper funds. Id.

20.   Debtor was notified of the reversal of the charges by Wells Fargo on November 18 or 19, 2004.  Ex. 13 ( Depo. Ex. 193); Moen Tr. 25-26.

21.   On November 22, 2004, Debtor attended a meeting at Wells Fargo to discuss the bad checks from ANJ.  Ex. 13 ( Depo. Ex. 193); Moen Tr. 25-26.

22.   Debtor did not notify American Express that the checks had been dishonored.  Instead, between November 19 and December 2, 2004, Debtor purchased an additional $2,278,972.11 in cigarettes from Costco using the American Express cards issued to Bakersfield Wholesale. Ex. 10 (Depo Ex. 33).

23.   Debtor's purchases on the American Express cards made after November 19, 2004 were made with full knowledge by Debtor that Bakersfield Wholesale would never be able to pay for the goods he purchased, and that Debtor never intended to repay American Express. Id.

24.   It was not until December 4, 2004, that American Express learned of the bad checks. This happened when Wells Fargo reversed Bakersfield Wholesale's payments to American Express due to insufficient funds in the account from which the payments were made.  Immediately thereafter, as a result of these "bounced" payments, and Bakersfield Wholesale's failure to pay any portion of the outstanding balance owed since October 2004, American Express terminated the subject American Express accounts and demanded payment in full of the

$3,683,320.97 balance owed. <u>Compare</u> Ex. 1, ¶¶ 19-29 (the original complaint in the District Court Action) with Ex. 2, ¶¶ 13-20 (Abdo and Bakersfield Wholesale's answer); Ex. 14.

25.  Despite that demand, Debtor did not make any payment whatsoever to American Express. <u>Compare</u> Ex. 1, ¶¶ 19-29 (the original complaint in the District Court Action ) with Ex. 2, ¶¶ 13-20 (Abdo and Bakersfield Wholesale's answer); Ex. 14.

**D.    American Express Brings the District Court Action**

26.  Within three weeks of learning of the dishonored electronic transfers, American Express commenced the District Court Action and also sought a preliminary order of attachment by order to show cause.  On January 4, 2005, the District Court signed a temporary restraining order (the "Order") preventing the defendants from transferring any Bakersfield Wholesale property that might be available to satisfy the debt.  Ex. 15.

27.  On the January 11, 2005 return date of such motion, the Court entered an order granting American Express' motion for a writ of attachment.  Ex. 16.

28.  On or about August 2, 2005, American Express obtained a judgment against both Debtor and Bakersfield Wholesale in this action in the sum of $3,683,320.97, which still remains due and owing, together with accrued interest.  Ex.17.

**E.    The Debtor Sells the Costco Cigarettes**

29.  In his answer to the complaint in the District Court Action, dated January 26, 2005, Debtor admitted that Bakersfield Wholesale purchased the Costco Cigarettes, and stated that such cigarettes were "ultimately sold."  Ex. 2 at ¶18.

30.  When first deposed, on March 14, 2005, Debtor refused to disclose to American Express what Bakersfield Wholesale did with the cigarettes, or any other information about the sales proceeds, invoking the Fifth Amendment privilege against self-incrimination.  Abdo I Tr. 22-24.

31.  Debtor also invoked the Fifth Amendment concerning the Costco Cigarettes at a contempt hearing in Court on April 4, 2005.  Abdo II Tr. 26.

32.  When deposed a second time, on December 22, 2005, Debtor testified that he had auctioned off all his remaining inventory of cigarettes, and any other property of Bakersfield Wholesale.  However, he refused to state what had been done with the proceeds, or disclose the amount of the proceeds he had obtained.  Abdo III Tr. 40-41 ("When I close my business. . . . I auction off everything."), 49-50 ("I don't remember" the customers who purchased cigarettes); 51-52 ("I don't remember" how much money was made from sales of cigarettes bought with American Express care); 51-52 ("I can't remember" a single customer's name); 65-69 (Abdo auctioned off all remaining assets of the business, such forklifts, shelves and computers).

33.  When asked during such deposition what he had done with the remaining proceeds of the $3.6 million of Costco Cigarettes, Debtor stated:  "I don't remember.  It's been awhile." Abdo Tr. III 102-04.

34.  During his second deposition, on December 22, 2005, Debtor testified that he threw away or destroyed all of the business records which would have enabled American Express to determine the value of the inventory or other business assets which Debtor had sold.  Debtor readily admitted that he "threw all [his]. . . paperwork away. . . [b]ecause I had nowhere to take them [his files] and I was mad, and I throw [away] all the files, all the cabinet[s], everything." Abdo Tr. III 23-24, 38, 51-52 ("I throw all the records away" about who purchased the inventory after Debtor closed Bakersfield Wholesale); 67-68 (Debtor deleted all business information from his computers before selling them to third parties); 97-99, 131-33 (Debtor threw away all business records of Bakersfield Wholesale, such as the minute books, ledgers and payroll records), 140-46, 167-68 (Debtor had no records of the "auction" of Costco Cigarettes; and threw all records of the business into a dumpster).

35.  As a result of Debtor's destruction of the records of Bakersfield Wholesale, Debtor could not value the Bakersfield Wholesale inventory that he admits having sold to third parties, or document what he did with the cash proceeds.  Id.

7

**F.  Debtor's Brother Forms a Successor Business and Attempts to Shield Debtor's Assets**

36.  Immediately after Debtor shut down Bakersfield Wholesale, his brother David opened a successor business, "Bakersfield Grocery Wholesale." <u>See</u>, <u>e.g.</u>, David Tr. 293; Ex. 18 (Depo Ex. 39); David Tr. 78-80, 94-95.

37.  Bakersfield Grocery Wholesale operated at the same address (402 California Avenue in Bakersfield) with the same telephone and fax numbers as Bakersfield Wholesale, selling the same type of goods to the same type of customers.  David Tr. 80-81 (telephone number and fax); David Tr. 261-82 (same customers and goods).

38.  Bakersfield Grocery Wholesale placed its orders in the name of "Bakersfield Wholesale" and its e-mail address was "Bakersfield Wholesale" at "yahoo.com." David Tr. 159 (orders) and David Tr. 345-46 (e-mail).

39.  In January 2005, Debtor gave David checks which had been made payable to "Bakersfield Wholesale Foods," for goods purchased in 2004 -- many of which were issued in 2004, before Bakersfield Grocery Wholesale was formed or licensed -- and deposited them directly into the bank account of the new entity, Bakersfield Grocery Wholesale.  David Tr. 246-51, 261-81.

40.  On January 3, 2005, David filed a Notice to Creditors of Bulk Sale with the Kern County Assessor on January 4, 2005.  The notice stated that on January 21, 2005, Bakersfield Wholesale intended to transfer its <u>entire</u> inventory to David for only $180,000.  Ex. 19 (Depo Ex. 12).

41.  The brothers planned this transaction because of Debtor's "problems with American Express." David Tr. 67-68; <u>see</u> David Tr. 65-69, David Tr. 234-37.

42.  On January 15, 2005, David canceled the bulk sale because of the TRO obtained by American Express in this lawsuit on January 4, 2005, which forbade transfers of assets from Bakersfield Wholesale to third parties.  David Tr. 237-38; Ex. 20 (Ex. 13).

43.  Debtor owned a home at 2516 El Portal Drive, Bakersfield, California.  In early January 2005, following the filing of the California Action, Debtor deeded title to the home to David for no consideration. Ex. 21 (Ex. 15); David Tr. 73-75.

44. Debtor put title to his house in his brother's name in order to attempt to prevent American Express from levying on the house. Abdo II 44-45 (he was trying to "save my house"); see also David Tr. 73-75 (admits transfer was because of "situation with American Express").

45. After American Express moved to hold Debtor in contempt for this fraudulent conveyance, the house was deeded back to him by David. Ex. 22 (Depo Ex. 16).

**G.** **The Storage of the Costco Cigarettes at Fortress**

46. On December 6, 2004, after American Express had demanded payment from Debtor, his brother David rented a large unit at a storage facility in Bakersfield, California, i.e., Fortress. Smith Tr. 6-8, 14-19; Ex. 23 (Depo Ex. 77) (rental agreement); David Tr. 543-44; Smith Tr. 14-21.

47. Receipts show that monthly payments were made to Fortress through June 11, 2005. Ex. 24 (Depo Ex. 72); Smith Tr. 21-23.

48. Debtor rented trucks to move the Costco Cigarettes from the Warehouse at 402 California Avenue to the unit at Fortress rented by David. Debtor told David at the time that he was transferring "inventory" to Fortress in order to prevent American Express from seizing it. Abdo IV Tr. 18-19, 21-23, 30-34.

49. At a July 25, 2007 hearing before the District Court, David also admitted (1) that he was helping Debtor following the close of Bakersfield Wholesale because "American Express was trying to get money from him" (Hearing Tr. at 73-74, 77); (2) that David rented the Fortress storage space so that Debtor could "store his produce in there" (Hearing Tr. at 79-80); and (3) that Debtor told David he wanted to store something at Fortress "until he settled with American Express" (Hearing Tr. at 100-101).

50. Debtor did not produce to American Express any business records detailing the transfer of the Costco Cigarettes or their sale.

51. Debtor or David accessed the storage facility at Fortress on a regular basis -- at least fifteen times between December 6, 2004 and July 4, 2005, the date of a fire at the facility. Smith Tr. 27-28, 41-44; Ex. 25 (Depo Ex. 82).

**H.    The Fire at Fortress and its Aftermath**

52.  A fire at the Fortress facility destroyed the Costco Cigarettes that were still being stored there as of July 4, 2005.

53.  The renter deemed responsible for the fire was insured by Travelers, which engaged an insurance adjuster, Cunningham Lindsey U.S., Inc. ("Cunningham Lindsey"), to handle the claims.  The representative of Cunningham Lindsey was Robert Bycott ("Bycott"), an experienced adjuster who had investigated hundreds of fires, and at least ninety fires in commercial buildings.  Bycott Tr. 7-13.

54.  After the fire, David arranged to have the remaining cigarettes removed to a container unit near the Warehouse at 402 California Avenue.  Smith Tr. 39-40; Ex. 26 (Depo Ex. 80), Ex. 27 (Depo Ex. 69)(photos), Ex. 28 (Depo Ex. 84) (second July 21 entry); Exs. 29-30 (Depo Exs. 88-89) see David Tr. 575, Ex. 31 (Depo. Ex. 81) (David agrees to the release of property stored at Fortress).

55.  A photograph taken shortly after the fire shows Debtor standing in front of the damaged cigarettes at the Fortress unit.  Abdo IV Tr. 59-64; Ex. 27 (Depo Ex. 69).

56.  In order to establish the value of the cigarettes destroyed at Fortress, David submitted receipts showing the cost of the cigarettes.  The receipts which he submitted are the November-December 2004 receipts for the purchase of cigarettes by Debtor, at Costco, using the American Express credit card.  Bycott Tr. 39-40, 42; Ex. 32 (Depo Ex. 151).

57.  Based on these receipts, and upon a well-regarded salvage company's estimates of the volume of lost cigarettes, Travelers estimated the value of the lost inventory at $341,197.28.  Bycott Tr. 39-74; Ex. 28 (Depo Ex. 84) (entries for July 26, August 15, 19 and 30, and September 12-15, 2005); Exs. 33, 34, and 35 (Depo Exs. 90, 91 and 92); David Tr. 594-95.

58.  In the fall of 2005, David traveled to Yemen, and Debtor took over the negotiations with the insurer, contacting Bycott several times to monitor the progress of the insurance claim.  Ultimately, Travelers made an offer to settle for $341,197.28.

59. On November 28, 2005, Debtor advised Bycott that he had "reviewed the settlement for [$341,197.28] with David Aezah and Aezah agrees." Bycott Tr. 79-92; Ex. 28 (Depo Ex. 84) (entries for October 18, November 7, November 28 and November 29).

60. David returned to the United States and personally delivered a release to Bycott on December 27, 2006. Travelers issued a check to David in the amount of $341,197.28. Ex. 36 (Depo Ex. 43); Ex. 28 (Depo Ex. 84) (November 29, December 27, January 3 and January 9 entries); Bycott Tr. 93-96; Exs. 37, 38, and 39 (Depo Exs. 97, 98, 99) (Bycott's letters to David and Debtor); Ex. 40 (Depo Ex. 101) (release of Travelers executed by David); David Tr. 609, 613-17.

61. On or about January 11, 2006, David deposited the $340,000 check into Bakersfield Grocery Wholesale's account at Citibank. Ex. 34 (Depo Ex. 43).

62. Debtor admitted that David took this $340,000 from the insurance company and gave it to him in cash. Abdo IV Tr. 51-53; Ex. 41 (Depo Ex. 39); Abdo IV at 136, 171-72, 226-28; see also David Tr. 619-21, 624-25 (confirming Debtor's testimony).

63. Before American Express learned about the Fortress storage facility, during his second deposition, taken on December 22, 2005, Debtor testified that he "didn't remember" what he had done with the Costco Cigarettes (Abdo III Tr. 37) or that he had immediately "auctioned" all the cigarettes (Abdo III Tr. 41) – all at the very time that he and his brother were hiding them at Fortress.

64. At this second deposition, Debtor failed to disclose the Fortress location or the $340,000 in funds that he expected to receive from his brother as a result of their insurance claim. See Abdo III Tr. 102-03 (testifying that he could not remember what he did with the cash proceeds from the cigarettes).

65. Moreover, Debtor denied at this second deposition that his brother had "any money or property or assets" belonging to Debtor. Abdo III Tr. 93.

I.   **The Ice Cream Business**

66. After Debtor received the $340,000 payment from David, he used the proceeds to buy an ice cream company. Abdo IV Tr. 42-48, 51-53.

11

67.   The business ultimately failed, and Debtor sold off some or all of the ice cream equipment piecemeal. Abdo IV Tr. 42-48, 51-53.

68.   Debtor did not disclose this transaction to American Express until his third deposition in the District Court Action.  Abdo IV Tr. 42-48, 51-53.

69.   Debtor did not keep any business records concerning the sale of equipment, informing the buyers of the ice cream equipment that he needed to deal in cash because there was a judgment against him, which he was evading.  Abdo IV Tr. 42-48, 51-53; Ex. 54.

70.   During his third deposition, Debtor failed to disclose another $200,000 in ice cream equipment still in his possession at the time.  Abdo IV Tr. 42-48, 51-53.

**J.    The So-Called "Theft" of Millions of Dollars Of Cash from Debtor's Home**

71.   In December 2005, Debtor reported a theft of $2.3 million from his home to Officer Sean Underhill of the Bakersfield Police Department on December 12, 2005.  Underhill Tr. 5-37; Ex. 42 (Depo Ex. 104).

72.   Just days later, during his deposition of December 22, 2005, Debtor testified that the money stolen from him included all remaining proceeds of the sale of the Costco Cigarettes and any other inventory of Bakersfield Wholesale.  Abdo III Tr. 135-37 (the stolen money included the "proceeds" of his "inventory" (including the sales of cigarettes) from "all the business in D & A Corporation [Bakersfield Wholesale]").

73.   During his last deposition in January 2007, Debtor changed his testimony, saying that none of the money at his home came from the sale of Costco Cigarettes and that his estimate of $2.3 million was an "honest mistake," and that "[i]t wasn't that much." Abdo III Tr. 96-97.

**K.    The Transfers of Cash to Yemen.**

74.   David wrote approximately $350,000 in checks on his personal account and on the account of Bakersfield Grocery Wholesale in the fall of 2005 through the spring of 2006 to various individuals which were cashed in Yemen.  The payees included such individuals as "Hussien Alaya" and "Abdulghani Aizh."  Copies of the checks are annexed as  Ex. 43 (Depo Ex. 49).

12

75.   Some or all of the funds sent to Yemen came from the sale by Debtor of the Costco Cigarettes.  See Ex. 46 (Kleckner Report).

**L.     The Purchase of the Mississippi Property**

76.   In or about April 2006, the Aezahs began negotiations to purchase the "Carver Village Apartments," a large apartment complex located at 1912 Live Oak Street in Pascagoula, Mississippi (the "Mississippi Property").  David Tr. 324-31.

77.   In 2006, the property was listed for sale through the real estate firm of Cumbest Realty, Inc. ("Cumbest Realty").  David Tr. 324-31.

78.   Although the investment was made in David's name, Debtor was personally involved in all negotiations for the transaction (including price negotiations), and traveled to Mississippi in order to inspect the property before David purchased it.  David Tr. 324-31.

79.   In order to pay for the property, on May 9, 2006, Debtor and an employee of Bakersfield Grocery deposited 6,000 $100 bills, for a total of $600,000 into the bank account of Bakersfield Grocery Wholesale at Citibank, and on May 10, 2006, Debtor and the employee deposited another $707,500 in $100 dollar bills into the bank account.  See Ex. 44 (Depo Ex. 44); David Tr. 314-22, Abdo IV Tr. 189-93.

80.   The $1.3 million in cash was deposited into Bakersfield Grocery Wholesale's Citibank account, all in one hundred bills, and this money was used to buy the Mississippi Property.  See David Tr. 314-22, Abdo IV Tr. 189-93.

81.   On or about May 17, 2006, David closed on the purchase of the Mississippi Property, using the cash Debtor had deposited into the Bakersfield Grocery Wholesale account. David Tr. 333-36, 393-96; Ex. 45 (Depo Ex. 45).

82.   The $1.3 million used to purchase the Mississippi Property constituted at least some of the proceeds of the cash from the resale of the cigarettes charged by Debtor on Bakersfield Wholesale's American Express charge cards.  See Ex. 46 (Kleckner Report); David Tr. 403-59, 484-91; Exs. 47, 48 and 49 (Depo Exs. 54, 55 and 56); David Tr. 296-302.

13

**M.    The Sales Contract with the Life Foundation**

83.   In August 2006, the Aezahs learned that it would be difficult to develop the Mississippi Property because the buildings in question had been condemned or were in the process of being condemned for violations of building codes.  David Tr. 332-33, 338-40.

84.   Debtor and a handyman then traveled to Mississippi for seven to eight days and consulted with local contractors to determine whether the apartments could be brought into compliance with building codes.  David Tr. 337-43.

85.   David and the Debtor decided not to develop the property, and began investigating the possibility of reselling it.  David Tr. 340-41.  Debtor began to make arrangements to list the property for sale through Cumbest Realty.  Ex. 50 (Depo Ex. 46); David Tr. 348-53.

86.   Ultimately, however, David began negotiations to sell the Mississippi Property to the Low Income Family Enrichment Foundation (the "Life Foundation") which had previously been interested in the property.  The parties negotiated a sale price of $1,450,000 and entered into a contract of sale dated July 17, 2006.  David Tr. 342-44, 356-60; Ex. 51 (Depo Ex. 48).

**N.    The Mississippi Lawsuit**

87.   On September 19, 2006, American Express, having learned about the proposed transaction from bank records produced by Citibank, brought an action in the United States District Court for the Southern District of Mississippi (the "Mississippi Action") in order to enjoin its sale and prevent the loss of the proceeds of the proposed sale.  Ex. 52.

88.   On November 13, 2006, American Express agreed to lift a lis pendens it had obtained and permit the sale of the Mississippi Property to proceed, subject to execution by David, American Express, and the Life Foundation of an Agreement and Escrow Instructions dated November 13, 2006 ("Mississippi Property Agreement").  Ex. 52.

89.   On February 21, 2007, American Express dismissed the Mississippi Action without prejudice, pursuant to a stipulation signed by counsel for David and American Express, and so ordered by the District Court in this action, which provides that the disposition of the proceeds of the sale of the Carver Village Apartments will be determined by the District Court.  Ex. 53 (Stipulation So Ordered by the District Court on February 5, 2007).

**O.    The Debtor's Failure to Keep Business Records Following the Collapse of Bakersfield Wholesale**

90.  Following the collapse of Bakersfield Wholesale, Debtor supported himself by wholesale dealings with merchants, and odd jobs, but did not maintain business records such as invoices or sales orders.  Abdo III Tr. 17-18; <u>see also</u> Abdo IV Tr. 76-78 ("after I have the problem with American Express, and after I have the judgment against me. . . I always tell them [employers] it have to be cash, I can't take no checks"); Abdo IV Tr. 78 ("I'm working under the table because American Express got judgment against me. . . .").

91.  During his last deposition, when asked yet again what he had done with the cash proceeds from the Costco Cigarettes, Debtor testified: "Give me a billion dollars, I hide it for you.  There's a lot of places to keep money.  I don't remember now exactly where I keep it, but I can keep it."  Abdo IV Tr. 89, 232-33.

**P.    The Debtor Files for Bankruptcy**

92.  On or about June 28, 2007, the Debtor filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Code.

93.  The schedules which accompanied the bankruptcy filing do not disclose the existence of or explain what happened to the Costco Cigarettes or their proceeds.  <u>See</u> Ex. 54.

94.  The schedules refer to ice cream equipment valued at $75,000 which the Debtor sold in October 2006, and to ice cream equipment valued at $200,000, which Debtor had in his possession at the time of his bankruptcy.  <u>See</u> Ex. 54 (Schedule B), Item 29 and Statement of Financial Affairs, Item 10.

## CONCLUSIONS OF LAW

1.  Rule 56(c) of the Federal Rules of Civil Procedure and Fed. R. Bankr. P. 7056 provide that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986).

15

2.   "Summary judgment is proper pursuant to Rule 56(c) 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law.'" Claude E. Atkins Enter., Inc. v. United States, 111 F.3d 138, 1997 WL 174162 (9th Cir. April 2, 1997). See ForSaleByOwner.com Corp. v. Zinnemann, 347 F.Supp.2d 868 (E.D. Cal. 2004) (same).

3.   To defeat summary judgment, the non-moving party "must respond with more than mere hearsay and legal conclusions [and] ... must do more than simply show that there is some metaphysical doubt as to the material facts." Orr v. Bank of America, NT & SA, 285 F.3d 764 (9th Cir. 2002). "[T]he defendant cannot rely on general denials but must demonstrate with evidence that is 'significantly probative' or more than 'merely colorable' that a genuine issue of material fact exists for trial." F.T.C. v. Gill, 265 F.3d 944 (9th Cir. 2001).

4.   In this case, American Express' motion is supported by uncontroverted statements of fact supported by competent evidence. The Debtor, despite additional time given by the Court, has not filed any opposition to American Express' motion.

5.   Based on the evidence in support of the motion, there is no genuine issue as to any material fact, and American Express is entitled to judgment as a matter of law, as set forth hereinbelow.

I.   **DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §727(a)(3)**

6.   The purpose of a discharge in bankruptcy is to give a debtor a "fresh start;" however, this opportunity is limited to the "honest but unfortunate debtor." Grogan v. Garner, 498 U.S. 279, 286-87 (1991); In re Britton, 950 F.2d 602 (9th Cir. 1991).   Congress has provided exclusions which prevent debtors engaging in dishonest conduct to take advantage of the discharge provisions of the Code.

7.   Section 723(a)(3) of the Bankruptcy Code is one such provision, and it provides:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might

16

be ascertained, unless such act or failure to act was justified under all the circumstances of the case. [Emphasis added].

8.    The purpose of this provision is "to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." In re Cox, 904 F.2d 1399, 1401 (9th Cir. 1990)("Cox I"), citing In re Underhill, 82 F.2d 258, 260 (2d Cir.) (applying the predecessor provision of Section 727(a)(3) of the Bankruptcy Act of 1898), cert. denied, 299 U.S. 546 (1936).  "Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records."  Cox I, 904 F.2d at 1401, citing Burchett v. Meyers, 202 F.2d 920, 926 (9th Cir. 1953).

9.    Under 11 U.S.C. §727, the initial burden of proof is on the plaintiff to produce evidence that the debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve" financial records which would explain debtor's losses.  Fed. R. Bank. P. 4005.  However, once plaintiff has presented evidence of a violation of §727, the burden shifts to the debtor to provide a credible and defensible explanation of what occurred.  If debtor cannot meet that burden, then he should be denied a discharge in bankruptcy.

10.    The Debtor in this case has admitted in prior proceedings that as soon as he learned that American Express was demanding immediate payment, he ceased the operations of Bakersfield Wholesale and threw away all of its records.  He has been unable or unwilling since that time to provide business records which show what he did with millions of dollars of Costco Cigarettes purchased using the American Express cards.  Moreover, following the collapse of Bakersfield Wholesale, Debtor conducted his business transactions in cash, and without any records, because he was purposely avoiding American Express' Judgment in the District Court.  See Sections E and P, supra.

11.    Based on the Debtor's uncontroverted destruction of business records, fraud and obstructionism in American Express' District Court Action, and refusal to provide a complete and accurate accounting of the business transactions that form the basis of American Express' judgment against him, the Court concludes that denial of discharge pursuant to 11 U.S.C. §727(a)(3) is appropriate.

## II.    DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §727(a)(5)

12. Section 727(a)(5) of the Bankruptcy Code provides that a debtor will be denied discharge when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under the paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

13. The Court should not hesitate to grant summary judgment where (1) a plaintiff makes out a prima facie case that the debtor has failed to explain the loss of his assets, and (2) the debtor fails to come forward with a full and satisfactory explanation about how the assets were lost. See Day v. Topsnik, 849 F.2d 1475 (9th Cir. 1988); In re Hawley, 51 F.3d 246 (11th Cir. 1995).

14. American Express has established that the Debtor obtained Costco Cigarettes worth millions of dollars, following their purchase with American Express charge cards. The Debtor has failed to satisfactorily explain the loss of these Costco Cigarettes or the proceeds thereof, and has willfully destroyed pertinent records from which such determination could have been made.

15. By reason of the foregoing, the Court concludes that denial of discharge pursuant to 11 U.S.C. §727(a)(5) is appropriate.

## III.    DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §727(a)(2)(A)

16. Section 727(a)(2)(A) of the Bankruptcy Code provides that the Court shall deny a Chapter 7 debtor a discharge where the debtor, "with intent to hinder, delay, or defraud a creditor has concealed property of the debtor, within one year before the date of the filing of the petition."

17. An objection to discharge under §727(a)(2)(A) is deemed to consist of two elements: (1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property. In re Lawson, 122 F.3d 1237, 1240 (9th Cir. 1997).

18. The Ninth Circuit has adopted the "continuing concealment" doctrine, which provides that the requisite act of concealment may occur more than one year prior to the bankruptcy filing so long as the debtor has retained a "secret benefit of ownership" in the subject property within the year prior to filing. See In re Lawson, 122 F.3d at 1240-41 (citing In re

Olivier, 819 F.2d 550, 555 (5th Cir. 1987)); In re Swenson, 381 B.R. 272, 290-93 (Bankr. E.D. Cal. 2008) (to the same effect).

19.    For purposes of § 727(a)(2)(A), a debtor may be found to have continuously concealed property where title is acquired in the name of a third party, but the debtor continuously enjoys, pays for, and otherwise controls the use and benefit of the property thereafter and within the year prior to his bankruptcy filing. See, e.g., Keeney v. Smith, 227 F.3d 679, 682-84 (6th Cir. 2000).

20.    As set forth in the uncontroverted Statement of Facts submitted by American Express, and adopted in the Findings above, the Debtor engaged in a deliberate and continuous scheme to hamper the collection efforts of American Express, which began in December 2004 and lasted up to and including his bankruptcy filing on June 28, 2007.

21.    By reason of the foregoing, the Court concludes that denial of discharge pursuant to 11 U.S.C. §727(a)(2)(A) is appropriate.

### IV.    EXCEPTION OF AMERICAN EXPRESS CLAIM FROM DISCHARGE PURSUANT TO 11 U.S.C. §523(a)(2)(A)

22.    Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge a debt obtained by "false pretenses, a false representation, or actual fraud."

23.    For purposes of this section, each time a "cardholder uses his credit card, he makes a representation that he intends to repay the debt…When the cardholder uses the card without an intent to repay, he has made a fraudulent representation to the card issuer." See American Express Travel Related Services Company Inc. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1126 (9th Cir. 1996) (quoting In re Anastas, 94 F.3d 1280, 1285 (9th Cir. 1996)).

24.    As set forth in the uncontroverted Statement of Facts submitted by American Express, and adopted in the Findings above, the Debtor defrauded American Express by charging more than $2.27 million dollars to the American Express cards of Bakersfield Wholesale for which he never intended to make payment.

25.    Specifically, by incurring $2,278,972.11 in additional charges after learning in November 19, 2004 that November 7, 2004 payments made to American Express would be dishonored by Bakersfield Wholesale's bank, the Debtor knew at the time that he incurred the

19

charges that he was never going to pay American Express and falsely represented to American Express that Bakersfield Wholesale intended to pay for these charges in full.

26. The Debtor's representations about payment were materially false and misleading.

27. American Express justifiably relied upon the Debtor's implied representation that Bakersfield Wholesale would pay American Express.

28. By reason of the foregoing, the Court concludes that the debt to American Express is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).

Dated:

Oct 31, 2008

United States Bankruptcy Judge